UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | )
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 16-789 (RMC) |
| | ) |
| **DOUGLAS F. GREER, M.D.,** *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

They say that diamonds are forever. Are contracts? The government asks the Court to enforce a False Claims Act settlement that it appears to have ignored for years. Douglas F. Greer, M.D., the counterparty, argues that the six-year statute of limitations has long since passed. Both parties move for summary judgment. Although the government is not entitled to recover on all of its claims, the Court finds that this lawsuit is timely, filed as it was within six years of Dr. Greer's completion of his related criminal sentence, and will grant in part and deny in part both motions for summary judgment.

**I. FACTS**

On May 3, 2007, Dr. Douglas F. Greer, an ophthalmologist, pled guilty for himself and his medical practice, Douglas F. Greer, M.D., P.C., to one count of Health Care Fraud, in violation of 18 U.S.C. § 1347, and one count of Filing a False Tax Return, in violation of 26 U.S.C. § 7206(1), for submitting fraudulent claims for payment as a medical doctor to Medicare and Federal Health Benefit programs for services not rendered or not medically necessary and for falsifying his business tax records. Minute Entry, *United States v. Greer*, No. CR-07-095-01 (RJL) (D.D.C. May 3, 2007). As part of his sentence, Dr. Greer was ordered to

1

pay a $25,000 fine on each count ($50,000 in total), unpaid taxes, and restitution totaling approximately $1.2 million. Judgment at 5, *United States v. Greer*, No. CR-07-095-01 (RJL) (D.D.C. July 26, 2007). He was also sentenced to 18 months imprisonment and 24 months of supervised release. *Id*. at 2-3. As special conditions of his supervised release, Dr. Greer was required to serve 180 days (6 months) in home detention with electronic monitoring and to perform 500 hours of community service within the 24-month period. *Id.* at 4. Thus, he was ordered to serve a sentence of three-and-one-half years in various degrees of confinement.

On July 24, 2007, before his criminal sentencing, Dr. Greer and his medical practice settled a parallel, $1 million civil suit brought by the government under the False Claims Act (FCA), 31 U.S.C. § 3729, in return for the liquidation of identified assets. *See generally* Ex. A, Def.'s Mot. for Summ. J., Settlement Agreement (Agreement) [Dkt. 23-1]. Specifically, because he did not have the funds to pay both the criminal penalties and the civil judgment, as part of the Agreement, Dr. Greer agreed, *inter alia*, to liquidate his retirement accounts, assessed at $1,011,747; liquidate other assets, assessed at approximately $500,000, $189,000 of which represented the limit of his Practice Guard Insurance policy; and sell his second house at 1811 47th Place, NW, Washington, D.C., assessed at $536,500. *Id.* at 2. Funds collected from these liquidations, net taxes, were allocated first to pay the criminal penalties and then to pay the civil debt, except that the monies from the insurance policy ($189,000) could only be contributed towards the civil debt. *Id.* ¶ 2.

On September 11, 2007, Dr. Greer paid the government $189,000 under the Agreement.[1] Ex. 5, United States' Mot. for Summ. J., Confirmation Notice of Receipt of

---

[1] Although this number matches the amount available under the insurance policy, Dr. Greer cannot recall the exact source of the funds. *See* Greer Dep. 51:2-4, Dec. 28, 2017 [Dkt. 24-7] (Q: "So you don't remember where that money come from?" A: "No, I don't.").

2

FEDWIRE Electronic Funds Transfer (EFT) by the NCIF [Dkt. 24-8]. Then, as ordered by the sentencing judge, Dr. Greer reported to prison on November 15, 2007. *See* Order, *United States v. Greer*, No. CR-07-095-01 (D.D.C. Oct. 19, 2007). At that time, he had not sold the house at 47th Place. The government did not insist. On March 5, 2009, Dr. Greer was released from prison to serve the duration of his sentence on supervised release, *i.e.*, until 2011. Federal Bureau of Prisons Inmate Locator, https://www.bop.gov/inmateloc/ (last visited Jan. 8, 2019) (search for BOP Register Number "29030-016").[2] He still did not sell the house. The government still did not insist. This situation continued until December 21, 2015, when the government sent Dr. Greer a letter informing him that he had breached the Agreement. Ex. 6, United States' Mot. for Summ. J., Letter from Oliver McDaniel, Assistant U.S. Attorney, to Alan Reider, Arnold & Porter (Dec. 21, 2015) [Dkt. 24-9] ("Your client is in breach of this agreement, having made no recent demonstrated effort to make a payment or to discuss a payment arrangement."). Dr. Greer refused to pay and the government filed the immediate Complaint on April 27, 2016, seeking to enforce the Agreement by compelling liquidation of Dr. Greer's existing retirement account and sale of the house at 47th Place. Compl. at 5 [Dkt. 1]. Both parties now move for summary judgement.[3]

---

[2] "[J]udicial notice may be taken of public records and government documents available from reliable sources." *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

[3] *See* Def.'s Mot. [Dkt. 23]; United States' Mot. for Summ. J. [Dkt. 24]; Mem. of Points and Authorities in Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n) [Dkt. 25]; Reply in Supp. of Def.'s Mot. for Summ. J. (Def.'s Reply) [Dkt. 29]; Mem. of Points and Authorities in Supp. of United States' Mot. for Summ. J. (Pl.'s Mot.) [Dkt. 24-1]; Def.'s Opp'n to Gov't's Mot. for Summ. J. (Def.'s Opp'n) [Dkt. 27]; United States' Reply Mem. in Resp. to Def.'s Opp'n to Pl.'s Mot. for Summ. J. (Pl.'s Reply) [Dkt. 28].

## II. LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the non-moving party. *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the non-moving party must still make a factual showing to create a genuine issue of material fact, and assertions of fact must be properly supported. *See id.* (citing *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)).

Federal district courts have the authority to enforce settlement agreements entered into by the litigants before them.[4] *See Samra v. Shaheen Bus & Inv. Group, Inc.*, 355 F. Supp. 2d. 483, 493 (D.D.C. 2005). "An agreement to settle a legal dispute is a contract[,] . . . [and] [t]he enforceability of settlement agreements is governed by familiar principles of contract law." *Village of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C. Cir. 1982). "An action to enforce a settlement agreement is, at bottom, an action seeking the equitable remedy of specific performance of a contract." *Samra*, 355 F. Supp. 2d at 493. Therefore, a district court may summarily enforce a completed settlement agreement—*i.e.*, one as to which there is no dispute as to "the material facts concerning the existence or terms of an agreement to settle." *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995); *see also Autera v. Robinson*, 419 F.2d 1197, 1202-03 (D.C. Cir. 1969).

---

[4] The Court has jurisdiction over civil actions brought by the United States. *See* 28 U.S.C. § 1345. Venue properly lies in this Court because all parties reside in this district, and the Agreement and enforcement thereof occurred in this district. *See* 28 U.S.C. § 1391(b).

4

## III. ANALYSIS

"[O]bligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988). "Courts must therefore apply the federal common law of contracts to the interpretation of contracts with the federal government." *Red Lake Band of Chippewa Indians v. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009) (citing *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 180 (D.D.C. 2007)); *see also United States v. Kearns*, 595 F.2d 729, 732 (D.C. Cir. 1978) (noting that "it is by now accepted that federal common law provides remedies in many situations," including "[g]overnment contracts"). To state such a claim, a party must show: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Red Lake Band of Chippewa Indians*, 624 F. Supp. 2d at 12 (citation omitted). "A breach of contract is simply the non-performance of a contractual duty." *Kasarsky v. Merit Sys. Prot. Bd.*, 296 F.3d 1331, 1336 (Fed. Cir. 2002) (citing Restatement (Second) of Contracts § 235(2) (1981)). When a contract does not specify a period for performance, "the law imposes an obligation to act within a reasonable period of time." *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 565 (Ct. Cl. 1966)). "That period is determined 'by the reasonable expectations of the parties in the special circumstances in which they contracted.'" *Id.* (quoting *Commerce Int'l Co. v. United States*, 338 F.2d 81, 87 (Ct. Cl. 1964)). The statute of limitations for the United States to sue for a breach of contract normally runs after six years. 28 U.S.C. § 2415(a).

### A. Amount Owed Under the Agreement and Performance To-Date

Some preliminary matters need discussion. First, the Complaint alleges that Dr. Greer agreed to pay $1 million to settle the FCA lawsuit, *see* Compl. ¶ 9, and that, having

already paid $189,000 towards that amount, he has an outstanding balance of $811,000, plus interest, to be paid by liquidation of his current retirement account and sale of the house at 47th Place. *See id*. at 5. This claim overstates the obligation. In the Agreement, the government "asserted a demand against Dr. Greer" for payment of $1,000,000," based upon his admitted crimes and false claims, *see* Agreement at 1; Dr. Greer represented that he could not pay such a judgment, *see id.* at 2; the parties, "to avoid the delay, inconvenience and expense of protracted litigation," agreed that Dr. Greer would liquidate certain assets in satisfaction of the FCA liabilities, *see id.* ¶ 2; and the parties recognized that any amount raised by liquidating the specific assets—except the $189,000 from the insurance policy—would first go towards the criminal penalties, *see id*. The Agreement does not contain terms for future payment, such as by wage garnishment or the like. Further, while the Agreement made clear that, no matter the total value of his assets, Dr. Greer was obligated "to make full restitution under the terms of the [criminal] Plea Agreement," *id.*, no such statement was included regarding the $1 million demand asserted. Thus, performance of the civil Agreement was to be satisfied by liquidation of specified assets (and documentation of the same) but not the payment of a specified amount, and in this context the government's FCA demand of $1 million serves as a cap to the funds the government can receive from Dr. Greer.

Second, it appears that Dr. Greer has already partially performed under the Agreement by liquidating some of the specified assets: $189,000 was paid to the government, which it clearly believes came from the insurance policy. *See* Greer Dep. 50:19-20, 65:22-66:6. Dr. Greer also liquidated his retirement accounts in 2007 and paid the proceeds to the government, *see id*. at 24:5-18, 51:14-19, and the government does not allege that he failed to liquidate the "other assets" worth $500,000. Compl. ¶ 9. The government argues that,

notwithstanding the liquidation of assets, no other payments were made under the Agreement, and seeks to force Dr. Greer to liquidate current retirement accounts that were not otherwise discussed in the Agreement; the Court notes that the Agreement required Dr. Greer to use the settlement funds to pay the criminal penalties first, about which the government makes no complaint. Because the Agreement does not require Dr. Greer to use assets outside of those described in the Agreement to satisfy the civil settlement, and because Dr. Greer already liquidated his retirement accounts, such as they were, in 2007, the Court will not require Dr. Greer to again liquidate his retirement accounts now.[5]

### B. Enforceability of the Agreement

Dr. Greer argues that given the confusion over the amount owed, the terms of the Agreement are too vague to enforce. Not so. The Agreement is neither unintelligible nor unenforceable simply because the government has sued for more than it is entitled to. At the very least, Dr. Greer is estopped from making this argument because he relied on the Agreement to obtain a lesser sentence during his criminal sentencing. *See* Sentencing Mem. at 19-20, 36-37, *United States v. Greer*, No. CR-07-095-01 (RJL) (D.D.C. Oct. 19, 2007) (using the Agreement to show that the government was the predominant victim of his fraud and arguing that the Agreement was already financially ruinous). Additionally, the Court finds no ambiguity as to the actual performance required. As discussed above, it is clear to the Court that, under the Agreement, Dr. Greer is not obligated to pay $1 million; he is obligated to pay *up to* $1 million, liquidated assets permitting. That the house at 47th Place may be worth more in 2019 than it was in 2007 is unavailing. Just as the government would have had no recourse had Dr. Greer sold his

---

[5] To the extent that Dr. Greer failed to document the liquidation of his assets and sale of the house, the government's remedy under the Agreement is "to file a false claims act lawsuit," for which Dr. Greer has waived the statute of limitations. Agreement ¶ 3.

7

house during the depths of the 2007-2008 recession, so too Dr. Greer has no recourse now. Indeed, the purpose of the Agreement was to avoid litigation over specific amounts; discrete actions satisfy its terms.[6]

### C. Sale of the House

This leaves for decision only the house at 47th Place, which should have been sold but was not. There is no question that Dr. Greer breached the Agreement; the question is when. Because Dr. Greer's breach was occasioned by his non-performance, and because no period for performance was specified in the Agreement, the Court must determine what reasonable period for performance was contemplated by the parties, based on facts provided and the context within which it was negotiated. The government filed its complaint on April 27, 2016, which means that to prevail here it must show that the performance period extended through at least April 28, 2010, so as to avoid the bar of the 6-year statute of limitations. For reference, April 28, 2010, is approximately 2 years and 9 months after the Agreement was executed; 2 years and 7 months after Dr. Greer paid $189,000 under the Agreement; 1 year and 2 months after Dr. Greer was released from prison; 348 days after Dr. Greer was scheduled to complete his prison sentence, if he got no good-time credit; and 10 months before the end of his supervised release.

Dr. Greer argues that his performance period ended in August 2007, after he entered his plea and failed to make payments or provide financial documentation to the government. This argument is totally unpersuasive. Dr. Greer *did* make payments in 2007—he liquidated both his retirement accounts in 2007, *see* Greer Dep. 24:5-18, and other assets, *see*

---

[6] The Court also notes that notwithstanding his arguments as to the equity of enforcing the Agreement, Dr. Greer has received benefits from continued ownership of the house and its rental income during the entire period since his plea. Greer Dep. 17:9-15.

8

Compl. ¶ 9, showing compliance with the Agreement. In addition, the accrual period would have reset in September 2007, when he paid $189,000. *See* 28 U.S.C. 2415(a) ("That in the event of later partial payment . . . the right of action shall be deemed to accrue again at the time of each such payment."). More to the point, retirement accounts and insurance policies are far more liquid than real property, and Dr. Greer was obligated to report to prison in November 2007. The Agreement is not unenforceable because the government forbore from enforcement before Dr. Greer reported to prison or served his sentence. Although Dr. Greer now argues it is theoretically possible that he could have sold the house at that time, there is nothing in the Agreement that supports his argument that such was his deadline. Similarly, Dr. Greer's second proposed date for the end of a reasonable period for compliance, January 2008 (six months after his sentencing and 2-3 months into his prison term) is no more reasonable because it would have required him to sell the house, document the transaction, and remit the funds while he was still serving his prison sentence.

Beyond these arguments, Dr. Greer remembers very little about the formation of the Agreement and so cannot hazard a guess as to the unspoken "intentions of the parties" at the time of its execution. Dr. Greer testified that, after his prison sentence, he thought that "everything had just gone away," and believes that he did not breach the Agreement by virtue of the fact that he "didn't remember the [A]greement." Greer Dep. 61:11-15, 63:21; *see also id.* at 64:1-2 ("[The Agreement] didn't cross my mind."). Having paid $189,000 under the Agreement, Dr. Greer also testified that he "'made no payments under the settlement agreement," and doesn't "understand all these figures now or . . . how they connect." *Id.* at 64:18-22, 65:17-21. Finally, when asked what the purpose of the Agreement was, Dr. Greer testified "I just don't remember.

This is ten years ago, and I do not remember." *Id.* at 71:16-22. Without more, there is insufficient evidence to rule in Dr. Greer's favor.[7]

---

[7] Dr. Greer does remember being terrified at the time. Greer Dep. 74:13-20. With good cause. As a snapshot of his criminal proceedings, the government proffered during his plea hearing that if the matter had gone to trial, it would have shown, "by clear and competent evidence and beyond a reasonable doubt":

> [T]hat between 1999 and 2002, Douglas Greer was an ophthalmologist practicing in Washington D.C. [and] in Annandale, Virginia. He serviced approximately 429 Medicare patients and 778 patients, many of which [sic] were members of the Federal Health Benefit Plan Program and other private insurance companies.
>
> With respect to his billing practices, the government would have shown that Dr. Greer performed or billed for performing numerous diagnostic tests that are mostly used to diagnose people with glaucoma. According to his own records, he billed for these diagnostic tests [when] only 23 percent of those patients required them. They were only medically necessary for 23 percent of those patients.
>
> He also performed what's known as an extended Ophthalmoscopy . . . , which is a very extensive look at the back of someone's eye. Only 17 percent of the bills he submitted, only 17 percent of those claims by his own diagnostic[s] were medically necessary.
>
> He also billed for what's known as fundus photography, which again is taking pictures at the back of someone's eyes to be able to make a diagnostic decision. He had a technician who took very clear, medically sound photographs of people's eyes. But in addition, Dr. Greer took his own photographs and billed for those, many of which were clearly unusable.

Ex. 1, United States' Mot. for Summ. J., Tr. of Plea Hr'g (Greer Plea) [Dkt. 24-4] at 25:2-26:1; *see also id.* at 26:2-29:9; Ex.2, United States' Mot. for Summ. J., Statement of Offense [Dkt. 24-5]. According to the Statement of Offense, which he signed and acknowledged, Dr. Greer received $281,018 for fraudulent glaucoma claims; $141,889 for fraudulent internal eye disorders; $88,686 for fraudulent and unrendered services for photographs; $37,022 for fraudulent ocular surgeries; $10,348 for fraudulent claims for unnecessary or unsupported tests; $39,726 for fraudulent unrendered or unnecessary claims to Medicare; $111,652 for fraudulent procedures beyond the maximum allowed; $103,767 for fraudulent claims for laser treatments; and $186,511 for fraudulent claims for another laser procedure. *See generally* Ex.2, United

The government argues by turn that the intent of the parties is discernable from the structure of the Agreement, which states:

> Greer shall provide to the United States specific documentation exactly detailing the monies obtained from the liquidation of the Retirement Accounts, the availability and amount of liquid assets, the actual payment of taxes related to the liquidation of assets, and the proceeds from the sale of the [House on 47th Place] including the actual payment of any related capital gains taxes. *Failure to provide adequate documentation shall be grounds for the United States to file a false claims act lawsuit regarding the allegations settled herein. The statute of limitations for those claims is agreed waived by the signing of this Settlement Agreement.*

Agreement ¶ 3 (emphasis added). This provision is key because the FCA normally has a statute of limitations of six years, *see* 31 U.S.C. § 3731(b), which would have run in December 2012. It therefore follows, the government argues, that the parties "anticipated payment well beyond 2012." Pl.'s Mot. at 22.

Rooted as it is in the text of the Agreement, the Court finds the government's position compelling. If Dr. Greer was expected to sell the house within the FCA's six-year statute of limitations, no waiver of that statute of limitations would have been required to enforce the documentation requirements. And while the government needed the stick of the FCA to enforce the documentation requirements because those requirements otherwise had no monetary value, it had another option for the enforcement of the sale of the house: suit in this Court. While Dr. Greer responds that it would be unreasonable to imply from waiver of the FCA statute of limitations an extended period for performance, the inference of his argument would require the Court to find that the parties intended the house to be sold immediately but only documented

---

States' Mot. for Summ. J., Statement of Offense. All of which totals $1,011,467 in monies received through fraud. *Id.* at 9.

11

years later. Otherwise, there would be no purpose behind the waiver for the FCA claims. Such an inference is unsound on its face. Notably, Dr. Greer supplies no facts or contract interpretation to support his claim.

Context also matters. Dr. Greer surrendered his medical licenses in the District of Columbia, Maryland, and Virginia before pleading guilty. Greer Plea 21:1-8. During his prison term, he lost his medical practice and the two rented locations in downtown D.C. and suburban Maryland at which he had previously practiced. Greer Dep. 59:12-60:18. Dr. Greer's wife had been employed by his medical practice. *Id.* at 42:20-21. Thus, his family income depended heavily upon his medical work. Dr. Greer's grown son is also "unemployable" and so depends entirely on Dr. Greer and his wife for financial support. *Id.* at 31:2-6. When Dr. Greer was released from prison, he was "facing trying to get the practice going back again" since "all the money [he] had, basically, was transferred to the federal government and then to those insurance entities." *Id.* at 60:19-21, 51:14-17. Against this chaotic backdrop, and without evidence to the contrary, the Court concludes that the parties could not and did not expect Dr. Greer to sell the house at 47th Place immediately; he had to rebuild his life. The Court also notes that while the Agreement settled the civil FCA lawsuit, it also pertained to the criminal monetary penalties imposed as part of Dr. Greer's criminal sentence. As such, the Court finds that there is sufficient evidence in the record to show that Dr. Greer had at least until the end his prison sentence—including supervised release—to perform under the Agreement.

Having thus determined that Dr. Greer had until at least 2011 to perform, the Court need not determine exactly when the Agreement was breached. In any event, the government's arguments about the repudiation doctrine provide an outer bound for that breach. Specifically, the government argues that, absent a time certain for payment, breach could only

12

occur after "(1) the performing party demands performance within a reasonable amount of time, and the other party still fails to perform within the time specified; or (2) the non-performing party repudiates the contract, and the performing party chooses to treat the repudiation as a breach." *Kasarsky*, 296 F.3d at 1336. Put another way, Dr. Greer was in breach either after he failed to perform upon a timely government demand or after he repudiated the agreement. *See id.* (stating that the repudiation doctrine "gives the promisee the right of electing either to wait until the time for the promisor's performance has arrived or to act upon the renunciation" (citing *Roehm v. Horst*, 178 U.S. 1, 13 (1900))). Both Dr. Greer and the government agree that Dr. Greer did not repudiate the Agreement, at least not until 2015 when the government made its demand for payment and Dr. Greer refused to pay, as evidenced by this lawsuit. Whether Dr. Greer's period for performance expired sometime between 2011 and 2015, or whether it would have extended indefinitely absent repudiation, is irrelevant—either way, he was not in breach in 2011, and he was in breach when he forced the government to bring this suit to enforce the Agreement.

The government brought its complaint for breach of contract within six years of 2011. Therefore, its complaint was timely.[8] Dr. Greer having asserted no other defenses to the breach of contract claim, the Court will require specific performance of his obligation under the Agreement.

---

[8] Dr. Greer also argues that waivers of statutes of limitations must be clear and unequivocal and the Agreement contains no such statement as to the statute of limitations for breach of contract. *See* Def.'s Opp'n at 6. The argument misinterprets the government's position. The point is not that the statute of limitations for breach of contract is greater than six years; it is that performance was not required until at least 2012 (after Dr. Greer's criminal sentence was completed in whole), and so it had until at least 2018 to file its complaint.

13

## IV. CONCLUSION

The government's motion for summary judgment, Dkt. 24, will be granted in part and denied in part. Dr. Greer's cross motion for summary judgment, Dkt. 23, will be granted in part and denied in part. A memorializing Order accompanies this Memorandum Opinion.

Date: January 22, 2019

ROSEMARY M. COLLYER
United States District Judge